BERNT OLSEN, Respondent, *v.* CHASE MANHATTAN BANK et al., Appellants, et al., Defendants.

Second Department, May 31, 1960.

*Patrick E. Gibbons* and *Royce A. Wilson* for appellants.

*Barnet S. Blume, Alfred E. Herz* and *Benjamin H. Siff* for respondent.

CHRIST, J. This action stems from an accident which occurred in the square block premises owned by the Chase Manhattan Bank (hereinafter referred to as the Bank) in the lower end of Manhattan Island. At that time foundations were being laid in the premises by three contractors, acting as joint venturers (hereinafter referred to as the Foundation Contractors), for the construction of a huge building for the Bank. Respondent, an employee of the Foundation Contractors, was injured when he was struck by a bull point or drill, of the type used in pneumatic drilling, which fell from a temporary platform about 30 feet above where he was stationed. Skidmore, Owings & Merrill (hereinafter referred to as Skidmore) had been engaged by the Bank to perform architectural services, including supervision of construction. Moran, Proctor, Mueser & Rutledge (hereinafter referred to as Moran) had been engaged by Skidmore to perform engineering services with respect to the foundation work, including the drafting of plans and specifications, and supervision. Respondent sued, among others, the Bank, Skidmore, and Moran to recover damages for his personal injuries. The issues of liability upon which the case was submitted to the jury were whether the Bank, Skidmore and Moran had control and supervision over the platform and the bull point, whether they breached their duty to exercise reasonable care with respect to the maintenance of the platform and equipment thereon, which duty was present only if these three had control and supervision, and whether they violated stated provisions of sections 200, 240 and 241 of the Labor Law and of rule 23 of the Industrial Code of the Board of Standards and

Appeals of the Department of Labor of the State of New York (3 N. Y. Off. Comp. of Codes, Rules & Regulations, p. 651).

The jury returned a verdict in favor of respondent against Skidmore and Moran and against the respondent in favor of the Bank. Thereafter, the trial court set aside, on respondent's motion, the verdict insofar as it was in favor of the Bank on the ground that on the question of control and supervision the proof was much stronger against the Bank than against Skidmore and Moran, and that the verdict as to the Bank was against the weight of the credible evidence. The appeals are by the Bank from the ensuing order against it, and by Skidmore and Moran from the ensuing judgment against them.

At the time of the accident, and for some time prior thereto, the only contractors operating at the site were the Foundation Contractors and their subcontractors, and the only workmen there were employees of said contractors and subcontractors. There were certain pre-existing foundation walls or caissons in the excavation, and the plans of Skidmore and Moran called for their removal. However, the Foundation Contractors in the interim, had been using, for their own purposes, at least, some of the caissons. They had constructed platforms of heavy timbers, using caissons as supports for the timbers. The undisputed testimony of a member of the Skidmore firm was that these platforms were not part of the architects' plans and specifications, that the omission to demolish the caissons and the use of the caissons for the construction of the platforms were in pursuance of the plans and orders of the Foundation Contractors, and that Skidmore's approval was not required for "temporary platforms". One of such platforms was the one from which the bull point fell and struck respondent. There had been a space of about 8 to 12 inches wide for a length of about 8 or 10 feet between an edge of this platform and one of the caissons for about 5 or 6 weeks up to the time of the accident, and at that time there was a pile of bull points on the platform and near this space.

The contract between the Bank and the Foundation Contractors expressly required them "to furnish all labor, materials, equipment, plant machinery, staging tools and supplies * * * necessary to perform all of the work" shown on the plans and specifications in connection with the substructure work. It further provided that they were to have "sole supervision and direction" and "full control" of all the personnel and labor employed by them in this work, except that they must remove any workman who, in the opinion of the owner or the architects or the engineers, is unfit or guilty of improper con-

duct. Payment to the Foundation Contractors was to be a fixed amount plus their actual costs on the job.

The contract between the Bank and Skidmore required Skidmore, among other things, to prepare the plans and specifications for the construction of the building, to render "Complete supervision of the Work, including the checking of shop drawings" and including certain services not here relevant, "supervision and control over the Work of the various contractors together with" verification of their charges, "and such general administration and supervision of the Work as may be required to furnish the Owner with a finished building in conformance with the drawings and specifications", and to "keep the Owner continuously informed as to all steps taken by them in connection with such supervision."

The contract between Skidmore and Moran required Moran, among other things, to act as Skidmore's consulting engineers on the foundations, give "general advice", furnish the plans and specifications as to the foundation, check the contractor's working drawings, and "provide general supervision * * * to insure that the prosecution of the work is in accordance with plans and specifications". The hiring of Moran was in pursuance of the contract between Skidmore and the Bank.

Under the contract by which Skidmore and Moran were hired, the foundation plans and specifications were produced by these two appellants and Moran supervised the foundation work as it progressed. Moran engineers were on the site continuously and made daily written reports to Skidmore, copies of which were given to the Bank. There was testimony that the reports "described the construction operations current at the time, the manpower, equipment on the job, general details of the operations of each period of the day" (three eight-hour shifts daily). In addition, a member of the Moran firm visited the site at intervals of not more than a week apart for a considerable period of time up to the time of the accident. He testified as to what the nature of Moran's duties on the job was, saying, among other things, that it was to supervise the "manner of the work" and the "general procedure", and the matter of "review and approval for safety at all times, both for temporary construction" and "permanent installations". One of the members of the Skidmore firm testified that he visited the site "perhaps once a week" and that many other representatives of that firm also "observed the project".

According to the testimony of an employee of the Bank, he and other "field representatives" of the Bank were also

stationed at the site continuously, for the purpose of checking the equipment that was delivered and used and the number of men working, but this was "because the project was a cost-plus basis " one, and this employee had no " authorization to approve the general progress " of the work, and no one else on behalf of the Bank " supervised the progress of the work " or its " manner " or " type ".

The Bank owed respondent the common-law duty of furnishing a safe place to work (*Coughtry* v. *Globe Woolen Co.*, 56 N. Y. 124), which duty has been extended by statute (Labor Law, §§ 200, 241; Employers' Liability Law, § 2, " to include the tools and appliances without which the place to work would be incomplete " (*Hess* v. *Bernheimer & Schwartz Pilsener Brewing Co.*, 219 N. Y. 415, 418), and that duty is nondelegable (*Wohlfron* v. *Brooklyn Edison Co.*, 238 App. Div. 463, affd. 263 N. Y. 547). However, the Bank would not thereby become liable for respondent's injuries if the factors which caused them, namely, a defective platform and a falling bull point (appliances furnished by his employers), were no part of the Bank's plant (*Hess* v. *Bernheimer & Schwartz Pilsener Brewing Co., supra*), and if the injuries occurred because of the manner of performing a detail of his employers' work (*Wohlfron* v. *Brooklyn Edison Co., supra*).

The fact that the Bank, through Skidmore and Moran, exercised general supervision of the construction for the purpose of assuring that the foundation contract was being performed, does not affect this rule absolving it, as the owner, of any independent negligence of the Foundation Contractors (see *Herman* v. *City of Buffalo,* 214 N. Y. 316, 320) nor does the fact that the contract between the Bank and the Foundation Contractors empowers the Bank to require them to discharge incompetent workmen (see *Uppington* v. *City of New York,* 165 N. Y. 222, 233–234).

In our opinion, the accident occurred because of the manner in which a detail of the said contractors' work was being performed, and the situation was not one in which the Bank could be held liable for a breach of the obligation to furnish a safe place to work (cf. *Zucchelli* v. *City Constr. Co.*, 4 N Y 2d 52).

Assuming *arguendo* that rules 23–3.8 (overhead hazards), 23–4.1 (handling and storage of equipment) and 23–4.2 (piling and storage of building material) of the above-mentioned Industrial Code were applicable against the Bank, in which event violation thereof would be evidence of negligence (*Vallina* v. *Wright & Kremers,* 7 A D 2d 101, 109; *Utica Mut. Ins. Co.* v. *Mancini & Sons,* 9 A D 2d 116), the jury's finding on the issue

of negligence because of violation of these rules was in favor of the Bank, and we do not regard the evidence as warranting the setting aside of that finding. A verdict in favor of a defendant should not be set aside as against the weight of the credible evidence unless the preponderance in favor of the plaintiff was so great that the finding in favor of the defendant could not have been reached upon any fair interpretation of the evidence (*Mieuli* v. *New York & Queens County Ry. Co.*, 136 App. Div. 373, 375; *Holpp* v. *Carafa*, 8 A D 2d 617). In view of this conclusion that the verdict in favor of the Bank should not have been disturbed, the issue as to whether the above-mentioned rules of the Industrial Code were applicable is academic and need not be decided.

On the evidence presented, Skidmore and Moran, as architects and engineers, could be charged only with nonfeasance. For that it is possible they could be liable to the Bank, but not the respondent (*Potter* v. *Gilbert*, 130 App. Div. 632, affd. 196 N. Y. 576; *Clinton* v. *Boehm*, 139 App. Div. 73; *Clemens* v. *Benzinger*, 211 App. Div. 586).

The judgment should be reversed upon the law and the facts, and the complaint should be dismissed as against Skidmore and Moran. The order should be reversed, the respondent's motion should be denied, and the verdict should be reinstated insofar as it was in favor of the Bank and against the respondent.

A single bill of costs should be awarded to appellants against respondent.

Nolan, P. J., Beldock, Pette and Brennan, JJ., concur.

Judgment reversed upon the law and the facts, and complaint dismissed as against Skidmore and Moran.

Order reversed, respondent's motion denied, and verdict reinstated insofar as it was in favor of the Bank and against the respondent.

A single bill of costs is awarded to appellants against respondent.