Carmine PANICO, Plaintiff,

v.

AMERICAN EXPORT LINES, INC., Defendant and Third-Party Plaintiff,

v.

JOHN W. McGRATH CORP. and Societa Par Azioni Di Navigazione Genoa "Italia", Third-Party Defendants.

United States District Court
S. D. New York.

Dec. 26, 1962.

TYLER, District Judge.

This is a personal injury action brought by Carmine Panico, formerly a registered longshoreman, against American Export Lines, Inc., defendant. American Export impleaded, as third-party defendants, John W. McGrath Corp. ("McGrath"), a stevedoring company, and Societa Par Azioni Di Navigazione Genoa "Italia" ("Italian Line"). On December 3, 4 and 5, 1962 the plaintiff's case was tried before this court and a jury. By stipulation, the third-party claim was to be decided by the court without a jury. It was further stipulated by all parties in the third-party action that no other evidence than that adduced before the jury on the case in chief would be offered.

On December 5, 1962, the jury returned a verdict for plaintiff in the amount of $35,500. Judgment on this verdict has not been entered, nor has this court heretofore entered any findings of fact and conclusions of law with respect to the third-party action.

From a vantage point most favorable to the plaintiff, the jury could have found the following facts:

On the morning of December 30, 1957 plaintiff Panico was hired through the hiring hall by McGrath to work as a longshoreman on Pier 84, North River. At that time and other times not here pertinent McGrath was the contract stevedore, under an agreement with American Export, to do all stevedoring on Pier 84. Then, as now, American Export was the lessee of Pier 84 under a contract of lease with the City of New York. The Italian Line had a wharfage arrangement with American Export permitting it to tie up its vessels at Pier 84.

In the early afternoon of December 30 Panico was working on the south side of the lower deck of the pier where he was helping to load boxes of marble onto a truck. Working with him or in his vicinity were a hi-lo operator and, at least from time to time, a checker. The operator was a McGrath employee; the

Sylvia Miller, New York City, for plaintiff, Chester A. Hahn, New York City, of counsel.

Rudser & Fitzmaurice, New York City, for defendant and third-party plaintiff American Export Lines, Inc., James Hogarty, New York City, of counsel.

Joseph F. McGoldrick, New York City, for third-party defendant John W. McGrath Corp., Martin J. McHugh, New York City, of counsel.

William H. Morris, New York City, for third-party defendant Societa Par Azioni Di Navigazione Genoa "Italia", Edward F. Doran, Jr., New York City, of counsel.

checker was employed by American Export.

When the checker and hi-lo operator left the scene of work to get another machine, Panico was standing with his back to a three-tiered stack of cargo and some ten to twelve feet from it. A pallet of cargo from the third tier of the stack then fell or toppled over onto him, knocking him to the pier floor and causing comparatively serious injury to his right leg and lesser injuries to portions of his head and back.

There was testimony from three other employees of McGrath, who were working in the immediate vicinity of the accident, from which the jury could have found the following facts concerning the immediate circumstances of this "toppling" of the stack of cargo onto plaintiff:

The stack of cargo in question consisted of bales of sage leaves. The bales were approximately two feet high by three feet long and consisted of an outer covering of burlap over sage leaves. These bales were stacked two to four on a pallet. The pallets here were wooden platforms some four to four and one-half feet in width. The stack which fell on plaintiff consisted of tiers, apparently three in number, each tier consisting of a pallet with bales placed upon it. This stack of sage leaves had been on the pier for at least five to seven days prior to the accident.

At the time when the accident occurred, which was approximately 2:00 p. m., there were two ships alongside the pier being loaded or unloaded. One of the ships was the "Saturnia", belonging to third-party defendant Italian Line; it was unloading at the south side of the pier. An American Export vessel was tied up at the north side of the pier; the evidence was unclear as to which vessel of American Export it was. The evidence was clear, however, that substantial activity was taking place on both the upper and the lower levels of the pier. There was no particular activity shown close by the stack immediately prior to its falling on plaintiff.  •

One of plaintiff's witnesses, a longshoreman named Hall, who testified to having seen the stacked sage leaves for a substantial period preceding the accident, stated that there was nothing unusual in their appearance. However, another longshoreman, by the name of Halligan, stated that the sage leaves had "settled" or begun to "sag" several days prior to the accident.

As to the method used generally by McGrath in stacking this and similar cargo, it was indicated that it was the uniform practice to place "dunnage", or pieces of wood, on top of a pallet of cargo, to render its upper surface more level, and thereby facilitate the stacking of another pallet thereon. Such stacking of cargo was, also, the normal practice.

Witness Hall, who was working at the time of the accident directly north, some thirty to forty feet, from the scene of the accident, stated, "I was staring across wiping my brow and I seen the pallets give way."

The plaintiff here has expressly relied upon the doctrine of *"res ipsa loquitur"*. Of the many attempts to describe this concept, I find to be most precise and meaningful that statement of the Court of Appeals of New York that this doctrine imports a " 'common-sense appraisal of the probative value' of circumstantial evidence." Foltis, Inc. v. City of New York, 287 N.Y. 108, 115, 38 N.E.2d 455, 460, 153 A.L.R. 1122 (1941).

Where the doctrine is applied, it manifests, in two chief respects, a relative relaxation of the normal requirements or standards of proof which a plaintiff usually must meet in proving his case.

First, it allows a plaintiff to rest his case rather more heavily on "circumstantial evidence"; that is, on evidence which to a greater extent than "direct" evidence, relies, in leading the trier of fact from the evidence to the conclusion sought to be proved, upon the process of reasoning known as inference. Secondly, and closely related to the first point, the doctrine, when applied, relaxes the requirement that the plaintiff prove,

with some degree of certainty, specific acts or omissions alleged to constitute negligence.

As the doctrine is normally defined, it is applicable when, and only when, three requirements are met: (a) the event sued upon would probably occur only by reason of negligence; (b) the event was caused by instrumentalities in the exclusive control of the defendant; (c) it appears that there was no contributory negligence on the part of plaintiff.[1] Manhat v. United States, 220 F.2d 143, 146 (2d Cir., 1955).

The effect of the plaintiff's establishing these three facts is that it then becomes "permissible to infer that the party in control was negligent". Manhat v. United States, supra, p. 146. But clearly there is nothing magical or absolute about this formula. And whether the inference of negligence is, on a given set of facts, warranted, as well as being "permissible", depends, as was said above, upon a " 'common-sense appraisal of the probative value' of [the particular] circumstantial evidence" adduced.[2] Crucially, the plaintiff is never relieved of his burden of proving negligence by a preponderance of the evidence. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 113, 62 S.Ct. 156, 86 L.Ed. 89 (1941). That is, the plaintiff has, as always, the burden of proving that it is more likely than not that the defendant was negligent.

The facts of the case at bar lead me to focus on the element of "exclusive control". The significance of this element is two-fold. First, and most important, it supports the inference that if negligence caused the injury then such negligence is attributable to the defendant. But in addition it is said to establish that the defendant is the only one with access to the facts surrounding the event, and hence as a practical matter he, and not the plaintiff, should be called on to produce the "direct" evidence. Cf., Galbraith v. Busch, 267 N.Y. 230, 234, 196 N.E. 36 (1935).

It is my view that plaintiff's case is weak in respect to both these branches of the policy underlying the "exclusive control" rule.

It is by no means clear that American Export was, with respect to the instrumentalities which caused plaintiff's injuries, in "exclusive control" either in fact or in law. First, in law, an owner (or, as here, a lessee) is not liable, as a general proposition, for injuries caused by the negligence of a contractor in carrying out the "detail of the \* \* \* work" it is performing on the owner's premises. Olsen v. Chase Manhattan Bank, 10 A.D.2d 539, 543, 205 N.Y.S.2d 60 (2d Dept. 1960), aff'd. 9 N.Y.2d 829, 215 N.Y.S.2d 773, 175 N.E. 2d 350 (1961); Zucchelli v. City Construction Co., 4 N.Y.2d 52, 172 N.Y.S.2d 139, 149 N.E.2d 72 (1958); Wohlfron v. Brooklyn Edison Co., 238 App.Div. 463, 265 N.Y.S. 18 (2d Dept. 1933), aff'd. 263 N.Y. 547, 189 N.E. 691 (1933); Iacono v. Frank & Frank Contracting Co., 259 N.Y. 377, 182 N.E. 23 (1932). These cases, of course, recognize that the owner, lessee, or general contractor, as the controlling or supervising party may be, has a nondelegable duty of over-all control and supervision.[3] And, accordingly, where the unsafe condition was not the

---

1. The last requirement is particularly applicable where, as under the law of New York State, the law controlling here, the plaintiff has the burden of proof on the issue of contributory negligence.

2. More particularly, this determination is governed by the degree of certainty with which each of the three elements, as outlined above, has been established. Of course the degree of certainty required depends, in turn, upon whether the determination is being made (a) by the

judge on a motion for directed verdict, (b) by the judge on a motion for new trial, or (c) by the trier of fact in deciding the verdict itself, since each of these calls for substantially different criteria of certainty.

3. Cf., New York Labor Law, McKinney's Consol.Laws, c. 31, § 200, which is declaratory of this common law rule. Dittiger v. Isal Realty Corp., 264 App.Div. 279, 35 N.Y.S.2d 311 (1st Dept. 1942),

product of the "plant, tools [or] methods",[4] of the agency in immediate factual control, as was the case in Leonard v. Prince Line, 157 F.2d 987, 989 (2d Cir., 1946), or where the supervising party had a duty to observe and remedy the unsafe condition in its general supervising capacity, as was the case in Wohlfron v. Brooklyn Edison Co., supra, 238 App.Div. p. 466, 265 N.Y.S. 18, then liability for the injury falls upon such party having over-all control.

This means, then, that in the present case American Export had the requisite "exclusive control" over the acts or conditions producing plaintiff's injury, only if such acts or conditions were such as fairly fell within the purview of defendant's duties as the party in general control.[5]

■ As a matter of common sense appraisal, the plaintiff could establish such control in this case only by proving one or both of the following facts:

(a) The accident resulted from unsafe practices or conditions, generally, in the handling or storing of cargo on Pier 84.

(b) There was a specific unsafe condition, as to this particular stack of sage leaves, which American Export, or supervising agencies acting on its behalf, in the exercise of due care, either (i) saw and should have remedied or (ii) should have seen and remedied.

The plaintiff did not undertake proof of the factual contention set forth in paragraph (a) above. This is so notwithstanding the fact that it was and is reasonably within his means to show the normal practice, on Pier 84, of handling or storing such cargo as these bundles of sage leaves, the dangers attendant upon such practice, and, perhaps, the availability of other and safer means of storage and handling.[6] Accordingly, it is not surprising that there is no adequate basis in the evidence adduced at trial to support a finding that the general practice in handling or storing this type of cargo was an unsafe one.

As to the contention of fact set forth in paragraph (b), above, plaintiff, again, did not appear to regard direct evidence of such fact to be a proper or necessary part of his case. The only testimony relating to the physical appearance of this stack of sage leaves prior to the accident, which appearance is presumably the cornerstone of a finding that American Export had, or should have had, notice of a specific unsafe condition, was elicited by counsel for American Export and for McGrath on cross-examination of plaintiff's witnesses.

The plaintiff's case against American Export, aside from other peripheral inferences countenanced by the doctrine of *res ipsa*, rests essentially upon this testimony adduced by cross-examination.

Unlike Hall, witness Halligan noticed something special about the condition of the stack of sage leaves prior to the accident. He described this appearance, in response to questions put to him on cross-examination, as follows:

"A Well, they were not in too good shape, from getting the weight of one pallet with the bales on, it keeps going, and the bales keep squeezing down from the weight." (p. 175).

\* \* \* \* \* \*

"Q And what were they doing? Were they toppling over?
"A No.

---

rev'd on other grounds, 290 N.Y. 492, 49 N.E.2d 980 (1943).

4. Zucchelli v. City Construction Co., supra, 4 N.Y.2d p. 56, 172 N.Y.S.2d 139, 149 N.E.2d 72.

5. Since a showing of "exclusive control" is said to be a pre-requisite, or *prior* condition, to the application of the *res ipsa* doctrine, to invoke the evidentiary permissiveness of that rule in favor of a plaintiff's attempt to prove such control, would, presumably, be to stretch the chain of inference beyond the contemplation of the *res ipsa* rule.

6. For an example of evidence, similarly establishing the general standard of care applicable in the situation, which was offered by a plaintiff in another *res ipsa* case, see Citrola v. Eastern Air Lines, 264 F.2d 815, 816 (2d Cir., 1959).

"Q Well what do you mean by that?

"A. They start to go down. (p. 176).

\* \* \* \* \* \*

"A They didn't look like in too good shape the way they were laying on the pallets. (p. 177).

\* \* \* \* \* \*

"Q Now, I want you to describe exactly what a good palletized tier of sage leaves looks like, and then describe what this tier that you saw fall looked like;

"A Well, the sage leaves—when a sage leaf is put on pallets—they are all tiered good.

"Q They are all tiered good?

"A But eventually the weight— they start to sag. (p. 177).

\* \* \* \* \* \*

"Q And has this always happened?

"A. No, not always.

"Q When does it happen?

"A Well, it happened that day, but it don't always happen.

"Q. You saw it go down that day, is that right?

"A I didn't see it go down.

"Q Now listen, the truth of the matter is that there was nothing unusual about these tiers of bales, isn't that so?

"A Well, they looked all right to me there for a while." (p. 178).

This testimony arguably supports an inference that the stack of sage leaves, in addition to being "settled down", was also *canted*, so as to suggest a further inference of the possibility, or probability, of toppling. Aside and apart from the problem of piling inference upon inference, however, the vagueness of the testimony bearing on this point, and on the question of the duration of such a visibly unsafe condition as well, leaves these crucial matters largely to conjecture.

If it appeared that evidence on these points were unavailable to plaintiff, either through this witness, or from other sources, then the spirit of *res ipsa loquitur*, if not the letter,[7] might suggest leniency in the requirements of proof placed upon plaintiff as to these fact issues. But, as was stated in Foltis, Inc. v. City of New York, 287 N.Y. 108, 115, 38 N.E.2d 455, 460, 153 A.L.R. 1122 (1941): "we must determine whether \* \* \* upon a 'common-sense appraisal of the probative value' of the circumstantial evidence, *measured in part by the test of whether it is the best evidence available*, inference of negligence is justified." (emphasis added).

Even supposing that witness Halligan is the only source of evidence bearing on the physical appearance of this stack of sage leaves prior to its falling, the "best evidence" of such condition would be a precise, orderly, concerted examination of Halligan on this point. Perhaps the result of such an examination would be as confused and inconclusive as the testimony now on record. But the important consideration is that such proof was and is properly a portion, and a crucial portion, of plaintiff's case. It is the plaintiff, therefore, who, in fairness and in reasoned application of the *res ipsa loquitur* doctrine, must be held accountable for the inadequacy and inconclusiveness of the evidence in this case as it bears on the physical appearance and condition of this stack of sage leaves prior to the accident.

The same reasoning, and result, obtain with respect to the fact issues of general practice, on Pier 84, in handling and storing cargo of this type. Here, too, the arguable availability of other evidence militates against application of the *res ipsa* rule to allow a verdict based solely, or chiefly, on "inference" alone.

To summarize, I am compelled to find that the plaintiff has fallen so far short of satisfying his burden of proof in this case, that it would be inconsistent with substantial justice to allow this verdict

7. See footnote 4 supra.

122

to stand.[8] Accordingly, and pursuant to my own "independent judgment after a weighing of all the evidence * * *", Williams v. Nichols, 266 F.2d 389, 393 (4th Cir., 1959), I feel constrained to set aside this verdict and grant the plaintiff a new trial. Rule 59(d), F.R.Civ.P.

 Considerations of fairness likewise compel me to order a new trial of the claim of American Export over against McGrath. The question of McGrath's possible "active" negligence is stacking these sage leaves, and the potential significance of McGrath employees having received (arguably, at least) actual notice of the condition of the stack of sage leaves before they fell, afford a substantial basis for the claim over by American Export against McGrath. A defendant's claim against a third-party defendant is by its very nature intimately tied in with the claim of the plaintiff against such defendant. Since, as I find here, that principle claim has been inadequately developed and tried, resolution of the rights and liabilities of all three parties should, in justice, await a new and, hopefully, more adequate trial of all the issues.

As to the claim of American Export over against Italian Lines, however, this has virtually no substance. The great weight of the evidence points to the conclusion that the sage leaves in question in fact did not come off the ship Saturnia belonging to Italian Lines. Even supposing there to be doubt on this point, however, there has been no suggestion, let alone substantial evidence, as to how Italian Lines might have been actively or passively negligent with respect to the condition of such sage leaves.

I conclude, therefore, that no useful purpose will be served in requiring Italian Lines to appear and defend once again in the third-party action. Accord-

ingly, it is directed that a judgment be entered dismissing the third-party claim against that company.

It is further directed that the verdict returned in this cause on December 5, 1962 be, and hereby is, set aside and vacated, that a new trial of the primary action be set for the January, 1963 term of this court and the third-party action shall abide the event of that new trial.

SO ORDERED.

---

8. In view of the medical testimony in this case as it relates to pain and suffering, I find the verdict here a somewhat excessive one. This, under the facts of this case, might not standing by itself warrant, if it would permit, the order herein setting aside this verdict. But since excessiveness of verdict may be an appropriate basis for such an order, Campbell v. American Foreign S.S. Corp., 116 F.2d 926 (2d Cir., 1941), I feel it proper to note here that the amount of the award in this case is a relevant—if marginal—factor in my decision.